## IN THE UNITED STATE DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

|  |  |
|---|---|
| _____ ) | |
| ROSETTA SPENCER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:11-cv-1178 (LO/TRJ) |
| ) | |
| DYNCORP INTERNATIONAL, LLC ) | |
| 3190 Fairview Park Dr. ) | |
| Falls Church, VA 22042 ) | |
| ) | |
| ) | |
| Defendant. ) | |
| _____) | |

### SECOND AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiff Rosetta Spencer ("Spencer" or "Plaintiff"), by and through her undersigned attorneys, brings this action against Defendant DynCorp, International, LLC ("DynCorp").  In support of this Second Amended Complaint, Spencer avers and states as follows:

### NATURE OF THE ACTION

1.      This is a civil action alleging discrimination, harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) *et seq.,* and 42 U.S.C. § 1981, and further alleging negligent retention and supervision.

### THE PARTIES

2.      Plaintiff Rosetta Spencer is a resident and citizen of the State of Texas and a former employee of DynCorp.

3.      Defendant DynCorp is a limited liability corporation organized under the laws of Delaware with its principal place of business in the Commonwealth of Virginia.

4.      At all times material hereto, DynCorp employed more than fifteen people.

5.      At all times relevant hereto, DynCorp acted as an "employer" within the meaning of the law at issue in this suit and is accordingly subject to the provisions of said law.

6.      At all times relevant hereto, Spencer was an "employee" of DynCorp within the meaning of the law at issue in this suit and is accordingly entitled to the protections of said law.

**JURISDICTION**

7.      Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over Spencer's federal claims pursuant to the Court's concurrent jurisdiction over claims arising under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) *et seq.* and over claims arising under 42 U.S.C. § 1981.

8.      This Court has diversity jurisdiction over Spencer's state law claims pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different states and the amount in controversy exceeds $75,000.

9.       This Court also has supplemental jurisdiction over Spencer's state law claims pursuant to 28 U.S.C. § 1367 because it has original jurisdiction over this action.

10.     DynCorp's principal place of business is located in Fairfax County, Virginia. DynCorp is subject to the personal jurisdiction of this Court because its principal place of business is located in Fairfax County, Virginia within the geographical area of the Eastern District of Virginia and the relevant records are kept within the geographical area of the Eastern District of Virginia.

11.     All conditions precedent to the institution of this suit have been fulfilled.  On May 17, 2011, the Equal Employment Opportunity Commission issued a Notice of Right to Sue in this matter.  This action, having been filed on August 15, 2011, was filed within 90 days of receipt of that Notice.

## VENUE

12.     Venue is proper in this district because Spencer was an employee of DynCorp, which has its principal offices and place of business in Fairfax County, Virginia, which is within the geographical area of the Alexandria Division of the United States District Court for the Eastern District of Virginia.  Venue is also proper in this district because personal jurisdiction exists within the geographical area of the Alexandria Division of the United States District Court for the Eastern District of Virginia.  Venue is also proper in this district as found by the United States District Court for the Western District of Texas, which transferred this action to this district.  *See* Docket Entry #14.

## FACTUAL BACKGROUND

13.     On September 26, 2006, Spencer began her employment for DynCorp as a security guard stationed at Camp As Sayliyah located in the State of Qatar.  Spencer's employment contract was for one year; thereafter, Spencer and DynCorp entered into one-year renewals of that contract.  The employment contract in force at the relevant time is attached hereto as Exhibit 1 and was to expire on its own terms on April 1, 2009, but with an expectation that it would continue.

14.     In order to work in Qatar, it was necessary for Ms. Spencer to have a work visa.

15.     It was DynCorp's obligation to make an application for a work visa for Spencer.

16.     DynCorp applied for a work visa on Spencer's behalf and that work visa was granted.  DynCorp applied for a subsequent work visa for Spencer, which expired on October 11, 2008.

17.     As security guard, Spencer's duties and responsibilities included ensuring the security of the base perimeter and protecting the health, safety and welfare of the civilian and military personnel on the base.

18.     From September 2006 through the date of her termination, Spencer received exemplary evaluations and reviews by her supervisors.  For example, for the year 2007, Mr. Navidad Gonzalez noted that "Ms. Spencer gives an outstanding job performance daily.  She is one of our most knowledgeable and capable guards."  Exhibit 2.  He further commented that she "has excellent knowledge of CAS policy and procedures.  She also has an outstanding judgment and highly motivated outlook."  *Id.*   In the category of "potential," he recommended that she be promoted "now."  *Id.*  He specifically recommended Ms. Spencer for the position of "Lead Guard."  She also received several commendations.

19.     Indeed, from time to time through mid-August, 2008, Spencer would be assigned as alternate Lead Guard.

20.     In addition to performing her duties and responsibilities at the highest level, Ms. Spencer enjoyed respect among her peers and was well-liked.

21.     Being a security guard at Camp As Sayliyah required constant vigilance as the area posed serious danger and risks to American personnel.  Security guards were armed and carried weapons when on duty.  These weapons included, among others, M/16 automatic rifles.

22.     DynCorp had strict procedures and protocols regarding weapon safety to ensure the personal safety of its employees.  The infrastructure of the guard position is based upon

4

safety and strict adherence to policy and procedure.  First, weapons are only loaded in an authorized area designated by the U.S. Army.  Moreover, a lead guard must be present to serve as the safety instructor whenever a weapon is being loaded.  Failure to adhere to these procedures is a terminable offense.  Spencer is aware of at least two individuals who were terminated by DynCorp for violating the DynCorp weapon safety procedures.

**DynCorp violates its contract with the Army and Army Regulations by Permitting An Employee (Mario Soto) access to weapons.**

23.     During the period April – July 2008, Lieutenant Colonel John Moyse, Provost Marshal of Camp As Sayliyah, twice gave DynCorp warnings that it had violated both the DynCorp-Army contract and the Army Regulations prohibiting a person with a previous domestic violence conviction from serving in the capacity of a guard and from carrying a weapon.  Specifically, in April 2008, Ltc. Moyse learned that Soto had a domestic violence conviction but was serving as a guard.  He immediately required DynCorp to remove Soto from this position.  One month later, he discovered that Soto was working in the joint military and contractor armsroom and was issuing weapons.  He again required DynCorp to remove Soto from this position.  He further informed DynCorp that if Soto was again given a position with access to weapons, Ltc. Moyse would ban Soto from Camp As Sayliyah.  Ltc. Moyse's tour as Proovst Marshal of Camp As Sayliyah ended on July 1, 2008.  At that time, Soto had been assigned to an administrative position with no access to weapons.

**DynCorp Again Violates its Procedures and Contract with the Army by permitting Soto to be armed; Soto thereafter endangers Spencer's safety and DynCorp refuses to take appropriate corrective action.**

24.     At some point after Ltc. Moyse's departure from Camp As Sayliyah, DynCorp reassigned Soto to a security guard position and permitted him to carry a weapon (to wit, an

M/16 automatic rifle).  DynCorp's action violated both the DynCorp-Army contract and the Army Regulations.

25.     On August 5, 2008, at approximately 4:35 a.m., Defendant Soto committed a violation of DynCorp's safety procedures and protocols.  Soto loaded an M/16 weapon in an undesignated area and did so with the muzzle of the weapon pointed at Spencer's head.  At the time, Spencer was bent down at her locker to retrieve some materials; when she looked up, she saw the weapon pointed at her head.  Soto hit the release button on the weapon and it snapped.

26.     Soto's actions posed a serious and substantial risk to Spencer's safety and welfare.

27.     Indeed, Spencer feared for her life during the August 5 Soto incident.

28.     Soto's sole reaction to the incident was to laugh.

29.     It was a violation of DynCorp's contract with the Army and a violation of Army Regulations for Soto to have access to a weapon, much less be in possession of a weapon, on August 5, 2008.

30.     As stated above, Ltc. Moyse, Provost Marshal of Camp As Sayliyah, had already twice warned DynCorp regarding its previous violations of procedures and the DynCorp-Army contract with respect to Soto.  Disregarding Ltc. Moyse's warnings, DynCorp deliberately and recklessly armed Soto directly after Ltc. Moyse's departure from Camp As Sayliyah.

31.     After Soto threatened Spencer's safety, Spencer promptly requested on August 5, 2008, the same day as the Soto incident, a meeting with Gregory West (Deputy Program Manager) and Clarence Moore (Assistant Operations Manager).

32.     A meeting took place later that day (August 5, 2008) between Spencer, West, Moore, and Bruce Nappi at which West acknowledged that Soto's actions constituted a firing offense.

33.     During that August 5, 2008 meeting, Dyncorp officials decided not to terminate Soto's employment because DynCorp did not have enough personnel.

34.     At this same August 5, 2008 meeting, both Spencer and Nappi advised West that Ltc. Moyse, Provost Marshal of Camp As Sayliyah, had required that Soto not be permitted to be in the armsroom because Soto had been charged with domestic violence while serving in the Army.

36.     The only corrective action that West was initially willing to take was to require a Lead Guard to accompany Soto from the armsroom to the clearing barrel each day.   In response to West's inquiry as to Spencer's reaction to this alleged "corrective" action, Spencer indicated that she felt the alleged "corrective" action was not strong enough given that Soto had endangered her safety and her life by pointing a loaded automatic rifle at her head.

37.     At about this time, Soto joined the August 5, 2008 meeting and in response to questioning by Nappi, admitted that he had endangered Spencer's safety and had violated DynCorp safety procedures.

38      West requested that Soto write an essay regarding weapons safety.  Spencer again protested that this was an insufficient response by DynCorp.  In response to Spencer's request that Soto be disarmed for 30 days, West agreed.

39.     The Army conducted an investigation and determined that Soto had committed a safety violation.

40.     Despite all of the above, DynCorp did not reassign Soto to a different position and did not take appropriate corrective action.

41.     Spencer protested DynCorp's failure to take appropriate corrective action and failure to provide proper safeguards.  She filed a complaint with the U.S. Army on August 13, 2008.

**Dyncorp refuses to promote Spencer to Lead Guard or Assign Her As Alternate Lead Guard.**

42.     On August 10, 2008, Tamra Vaughan, also a Guard employed by DynCorp at Camp As Sayliyah, informed Spencer that West had told Vaughan that West did not want to hire any additional black women for the position of Lead Guard.

43.     On August 10, 2008, DynCorp Human Resources Department requested Spencer to turn in her passport to their office so that Taylor could apply for a renewal of Spencer's work visa.

44.     On August 16, 2008, Spencer reported to her supervisor, Natividad Gonzalez (Program Manager),that West had said that he would no longer hire black women for future Lead Guard positions and that West wanted only white women in the Lead Guard position.

45.     Gonzalez replied to Spencer during their August 16, 2008 conversation that any person could apply for the Lead Guard position and then stated that he did not want to discuss the matter further with Spencer.

46.     After August 19, 2008, Spencer was no longer given any alternate Lead Guard assignments even though she had routinely been given this assignment prior to the August 5th incident with Soto and prior to her August 16th report of West's discriminatory comments, and even though Spencer continued to request these assignments.

47.     As of August 19, 2008, there were three Lead Guard positions vacant.

48.     On or about August 20, 2008, Spencer applied for a Lead Guard position.  West informed her that the position would not "re-open" until the following week.

49.     On September 3, 2008, Heather Taylor of DynCorp's Human Resources Department purported to interview Spencer regarding the incidents that Spencer had reported. Taylor was aware that West had stated he would not permit black women to be promoted to the Lead Guard position.  Taylor advised Spencer that charges could be brought against Spencer.  In so doing, Taylor harassed and intimidated Spencer.

50.     Spencer gave Taylor her resume to apply for the Lead Guard position, but Taylor refused to take it.  Taylor told Spencer to apply through the Shift Supervisor which is not in accordance with DynCorp procedures.

51.     Spencer again attempted to apply for the position and was told she could not apply without a recommendation from her Shift Supervisor.  DynCorp's procedures at the time did not require a recommendation by the Shift Supervisor.

**Soto again threatens Spencer's safety and DynCorp again refuses to take appropriate corrective action.**

52.     On August 22, 2008, Soto began to taunt Spencer with his M/16 weapon by pushing his release button and making it charge forward when she walked by him in the hallway. Soto thought this was funny and laughed.  Soto did this repeatedly.

53.     Spencer reported these events to the Security Administrator as she was afraid.

54.     On August 25, 2008, Spencer was re-assigned to a different team.  Spencer protested the reassignment and told West that this action was not appropriate given that she was the victim, not the instigator, and further, that Soto had violated DynCorp's safety procedures and protocols.

55.     On the same day, August 25, 2008, Spencer also sent an email to DynCorp's hotline regarding the August 5, 2008 incident with Soto.  Spencer sent a second email to the Hotline on August 31, 2008.

56.     On September 11, 2008, the Hotline informed Spencer that it had closed its investigation.  No action had been taken on Spencer's complaints.

57.     Other guards employed by DynCorp had been terminated or suspended for similar or less egregious violations of safety procedures and protocols than Soto.  Tamra Vaughn was terminated for a safety violation; James Alford was suspended for a safety violation.  Both Vaughn and Alford were security guards employed by DynCorp at Camp As Sayliyah.

**DynCorp refuses to issue a work visa renewal to Spencer and constructively discharges her.**

58.     On September 1, 2008, Spencer filed a complaint with DynCorp because Taylor had required that Spencer hand in her passport to Taylor and had refused to return the passport to Spencer.  In the meantime, Taylor had failed to renew Spencer's work visa.

59.      On September 2, 2008, Taylor returned Spencer's passport.  Despite having had Spencer's passport for several weeks, Taylor had not applied for a work visa renewal for Spencer even though Spencer's work visa would expire on October 10, 2008.  The normal time period for Dyncorp to renew a work visa was approximately 3-5 days.

60.     On or about September 8, 2008 Spencer advised Taylor that Spencer's work visa would expire on October 10th  and asked when she would receive a new work visa, but Taylor took no action to renew Spencer's work visa and refused to take Spencer's passport from her in order to apply for renewal of Spencer's work visa.  Taylor did not renew the work visa.

61.     By refusing to renew Taylor's work visa, DynCorp constructively discharged Taylor as Qatar law requires non-national workers in Qatar to have a work visa as a prerequisite

10

to performing any work.  Moreover, without such a visa, an individual is subject to prosecution

by the Qatar government.  At the end of September, Spencer was forced to give notice of her

resignation; her last day of work was October 9, 2008.  Spencer left Qatar on October 10, 2008.

62.     On October 7, 2008, Mr. Budharri told Spencer that somebody had tried to cancel

her work visa in August.  The only person who had had Spencer's passport and access to her

work visa at that time was Taylor.

## COUNT I

### (TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 - Discrimination)

63.     The allegations of the foregoing paragraphs are incorporated as if realleged

herein.

64.     Based on the foregoing, DynCorp engaged in unlawful employment practices in

violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of

1991, 42 U.S.C. § 2000e, *et seq.*

65.     In treating Plaintiff Spencer differently because of her race, color and sex,

DynCorp violated Title VII.

66.     Said violations were intentional and willful.

67.     Said violations warrant the imposition of punitive damages.

68.     As a direct and proximate result of DynCorp's actions, Spencer has suffered

injury, physical and emotional distress, pain, suffering, inconvenience, mental anguish, loss of

enjoyment of life, past and future loss of income, loss of benefits, lost career and business

opportunities and advancement, medical expenses, attorneys' fees and costs, other past pecuniary

losses, future pecuniary losses, and other nonpecuniary losses.

**COUNT II**
**(TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 - Retaliation)**

69.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

70.     Based on the foregoing, DynCorp engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, *et seq.*

71.     By retaliating against Plaintiff Spencer for her complaints of discrimination and harassment, DynCorp violated Title VII.

72.     Said violations were intentional and willful.

73.     Said violations warrant the imposition of punitive damages.

74.     As a direct and proximate result of DynCorp's actions, Spencer has suffered injury, physical and emotional distress, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, past and future loss of income, loss of benefits, lost career and business opportunities and advancement, medical expenses, attorneys' fees and costs, other past pecuniary losses, future pecuniary losses, and other nonpecuniary losses.

**COUNT III**
**(42 U.S.C. § 1981 - Discrimination)**

75.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

76.     Based on the foregoing, DynCorp engaged in unlawful employment practices in violation of 42 U.S.C. § 1981.

77.     In treating Plaintiff Spencer differently because of her race, DynCorp violated 42 U.S.C. § 1981.

78.     Said violations were intentional and willful.

79.     Said violations warrant the imposition of punitive damages.

80.     As a direct and proximate result of DynCorp's actions, Spencer has suffered injury, physical and emotional distress, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, past and future loss of income, loss of benefits, lost career and business opportunities and advancement, medical expenses, attorneys' fees and costs, other past pecuniary losses, future pecuniary losses, and other nonpecuniary losses.

**COUNT IV**
**(42 U.S.C. § 1981 – Retaliation)**

81.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

82.     Based on the foregoing, DynCorp engaged in unlawful employment practices in violation of 42 U.S.C. § 1981.

83.     By retaliating against Plaintiff Spencer for her complaints of discrimination and harassment, DynCorp violated 42 U.S.C. § 1981.

84.     Said violations were intentional and willful.

85.     Said violations warrant the imposition of punitive damages.

86.     As a direct and proximate result of DynCorp's actions, Spencer has suffered injury, physical and emotional distress, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, past and future loss of income, loss of benefits, lost career and business opportunities and advancement, medical expenses, attorneys' fees and costs, other past pecuniary losses, future pecuniary losses, and other nonpecuniary losses.

## COUNT V
## NEGLIGENT SUPERVISION AND RETENTION

87.     The allegations of the foregoing paragraphs are incorporated as if realleged

herein.

88.     DynCorp had a duty to its employees, including Spencer, not to retain employees

whom they knew or should have known were dangerous and likely to harm their employees.

89.     DynCorp had actual knowledge that Soto had been convicted of a domestic

violence offense while serving in the Army.

90.     DynCorp was warned twice by Ltc. Moyse that both the DynCorp-Army contract

as well as Army regulations prohibited DynCorp from permitting Soto access to or possession of

a weapon.

91.     DynCorp also had in its possession the DD214 Form completed by Soto

indicating his conviction of a domestic violence offense while serving in the Army.

92.     Spencer informed DynCorp about this conviction in the meeting of August 5,

2008 following Soto's violations of DynCorp's safety policies and procedures.

93.     Despite this knowledge of Soto's prior conviction for a domestic violence offense

while serving in the Army, DynCorp nonetheless repeatedly placed Soto in a position where he

had access to, and was in possession of, a weapon.

94.     DynCorp should have conducted a background check on Soto in which it would

have been discovered that Soto had a domestic violence conviction.

95.     DynCorp was negligent in its failure to conduct a thorough background check on

Soto and was negligent in its supervision and retention of Soto after DynCorp had knowledge

that Soto was not permitted to have access to or be in possession of a weapon.  DynCorp was

further negligent in its supervision and retention of Soto after Spencer reported the safety incident of August 5, 2008.  DynCorp was further negligent in its supervision and retention of Soto after Spencer reported the incident of August 22, 2008.

96.     DynCorp's supervision and retention of Soto and failure to protect Spencer from Soto was willful and wanton in that it exhibited a conscious disregard for the rights of Spencer. DynCorp exhibited a reckless indifference to Spencer's rights by failing to protect Spencer, failing to properly supervise Soto, failing to terminate Soto's employment or, at a minimum, reassign him to a different position.  DynCorp was aware, or should have been aware, from the existing circumstances that its failure to act to protect Spencer by its continued failure to supervise Soto and its retention of Soto would most likely result in harm to Spencer.

97.     DynCorp's retention of Soto and failure to properly supervise Soto constitute gross negligence and evinced a conscious disregard for the rights of Spencer.

98.     As a direct and proximate result of DynCorp's actions, Spencer has suffered injury, physical and emotional distress, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, past and future loss of income, loss of benefits, lost career and business opportunities and advancement, medical expenses, attorneys' fees and costs, other past pecuniary losses, future pecuniary losses, and other nonpecuniary losses.

99.     Due to the severity of DynCorp's conduct, Spencer is also entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Rosetta Spencer requests that this Court enter judgment in her favor, and against DynCorp on all counts as alleged herein, and further provide:

1.      An award of back pay and benefits, including prejudgment and post-judgment interest, in an amount to be determined at trial; and

2.      An order of reinstatement to the position Spencer would have obtained but for the conduct at issue herein or an award of front pay; and

3.      An award of all compensatory, special, and general damages, including prejudgment and post-judgment interest, in an amount to be proved at trial; and

4.      An award of punitive damages in an amount to be proved at trial; and

5.      An award to Spencer of her attorneys' fees, expert fees, and costs of this action ; and

6.      An injunction against Defendant to prohibit the types of illegal conduct as described herein; and

7.      An award to Plaintiff for any further relief as this Court may deem appropriate.

## JURY DEMAND

Plaintiff Spencer demands a trial by jury.

May 4, 2012                              Respectfully submitted,

                                         ROSETTA SPENCER

                                         By:     /s/ Susan R. Podolsky

                                                 Susan R. Podolsky (Va. Bar No. 27891)
                                                 Law Offices of Susan R. Podolsky
                                                 1800 Diagonal Road
                                                 Suite 600
                                                 Alexandria, VA 22314
                                                 571.366.1702 (telephone)
                                                 703.647.6009 (facsimile)
                                                 susanpodolsky@verizon.net


                                                 John R. Ates (Va. Bar No. 71697)
                                                 Ates Law Firm
                                                 1800 Diagonal Road
                                                 Suite 600
                                                 Alexandria, VA 22314
                                                 703.647.7501 (telephone)
                                                 703.229.6430
                                                 j.ates@ateslaw.com


                                                 *Counsel for Plaintiff*



**DynCorp International LLC  Qatar Branch**
P.O. Box: 24455, DOHA - QATAR, Tel.: (+974) 4608280 / 4608409
C.R. No.: 22745 - Fax: 4608288

شركــة داين كـورب الـدولـيـة ذ.م.م.- فـرع قـطـر
ص.ب: ٢٤٤٥٥، الدوحة - قطر، تليفون: ٤٦٠٨٢٨٠/٤٦٠٨٤٠٩ (+٩٧٤)
س.ت: ٢٢٧٤٥، فاكس: ٤٦٠٨٢٨٨

---

Date: 01 / April / 2008

### Employment Contract

**Between:**

**DynCorp International - Qatar**
Capacity:    Employer
Address:    P.O.BOX # 24455
        Doha, Qatar

### (First Party)

**Ms. ROSETTA SPENCER**
Nationality:...**American**
Holder of Passport No. **136076131**
Work permit  No : **26984000244**

#### Living in

St. Name: **Al Azalia,**
Building No. **Y Garden 10 / villa  # 1**
Area Name: **Old Airport**
Electricity No : **148753**

### (Second Party)

The Second Party declares that she is not presently committed to any other employment, and is **38** years of age at date hereof.

The First party has agreed to engage the Second Party in its service and the Second party has agreed to serve the First Party on the terms and conditions hereinafter stated.  The parties hereto have agreed as follows:

#### 1. POSITION

Subject to the terms and conditions of this contract  and to the First Party's rules and regulations presently in force or as may be deemed to form an integral part thereof, the First Party has agreed to employ the Second Party and she has agreed to service the First Party in the State of Qatar in the capacity of

التاريخ: ١ / ٤ / ٢٠٠٨

**عـقـد عمـل**

تم الاتفاق بين كلاً من

شركة داين كورب الدولية – قطر

بصفته:    صاحب العمل

وعنوانه: ص ب : ٢٤٤٥٥

الدوحة قطر

**(طرف أول)**

السيدة/  روسيتا سبينسر

الجنسية : أمريكي

حامل جواز سفر رقم: ١٣٦٠٧٦١٣١

ترخيص عمل ( البطاقة الشخصية): ٢٦٩٨٤٠٠٠٢٤٤

والمقيم بالعنوان التالي:

إسم الشارع:    العزالية

رقم السكن:  ويجاردينس  ويلا # ١

إسم المنطقة:  المطار قديم

رقم الكهرباء: ١٤٨٧٥٣

**(طرف ثاني )**

يقر الموظف بأنه غير مرتبط حاليا بأي عمل آخر

وأن عمرة يبلغ  **٣٨**  عاما بتاريخ هذا العقد ..

توافق الشركة على استخدام الموظف لديها ويوافق الموظف على العمل في الشركة وفقا للبنود والشروط أدناه.

**١– الوظيفة**

وفقا للبنود والشروط الواردة في هذا العقد وكذلك وفقا للوائح وأنظمة العمل الداخلية للشركة المعمول بها حاليا وحسبما قد يجري تعديلها هو وقت لآخر التي تعتبر جزءا أساسيا ومتمما لهذا العقد. يوافق الطرف الأول على  استخدام الطرف الثاني في دولة قطر في

Initial ⟨signature⟩

Exhibit 1



**DynCorp International LLC   Qatar Branch**
P.O. Box: 24455, DOHA - QATAR, Tel.: (+974) 4608280 / 4608409
C.R. No.: 22745 - Fax: 4608288

شــركــة دايـن كــورب الـدولـيـة ذ.م.م. فـرع قـطـر
ص.ب: ٢٤٤٥٥، الدوحة - قطر، تليفون: ٤٦٠٨٤٠٩ / ٤٦٠٨٢٨٠ (٩٧٤+)
س.ت: ٢٢٧٤٥، فاكس: ٤٦٠٨٢٨٨

__Guard__ or in any position as the First Party may from time to time determine and request the Second Party to assume at the Head Office or Branches of the First Party or in any organization or association in cooperation with it

### 2. DURATION OF CONTRACT AND PROBATION PERIOD

The duration of this contract is one year (01 April 08 – 31 March 09) commencing on the date of starting duty in the State of Qatar. The first six (6) months will be considered a probation period, (only applicable to new hires) during which the First Party has the right to terminate the contract by giving the employee three days prior notice.  The First Party shall bear repatriation expenses of the Second Party.  If the probationary period is satisfactorily completed the contract shall be in force for its unexpired term.  The contract expires at its expiry date without further notification.    However, if the First Party should notify the Second Party in writing about its desire to renew the employment contract of the Second Party at least thirty (30) days prior before the expiry date of the contract period.

### 3. HOURS OF WORK

The First Party will fix the hours of work from time to time in accordance with its operational requirement on a shift basis as determined by the Project Manager, but within the maximum limits authorized by the Local Labor Law ( 8 hours per day), and the Second Party shall abide by the First Party's working hours.

### 4. WAGE

The First Party shall pay to the Second Party during the latter's performance of her duties, at an annual base rate of __US$31686__ (approximately __115020__ Qatari Riyal) including the one paid rest day per week payable in arrears in __26__ equal payments over the course of the year. Additionally, while on duty status in Qatar, the Second Party shall receive a

وظيفة حارس أو في أي وظيفة أخرى كما يقررها الطرف الأول من وقت لآخر ويطلب من الطرف الأول أداءها فى المكتب الرئيسى أو الفروع للطرف الأول أو أي منظمة أو تجمع يكون في تعاون معه.

### ٢ـ مدة العقد وفترة التجريبية

مدة هذا العقد سنة واحدة(٢٠٠٨/٤/١ – ٢٠٠٩/٣/٣١) ميلادية ويسرى من تاريخ مباشرة الطرف الثاني للعمل لدى الطرف الأول فى دولة قطر ، وتعتبر الأشهر الستة الأولى فترة اختبار يجوز للطرف الأول خلالها إنهاء العقد بأخطار الطرف الثاني بذلك كتابة قبل ثلاثة أيام من تاريخ الانتهاء ويتحمل الطرف الأول تكاليف أعادته إلى بلده فإذا اجتاز الطرف الثاني فترة الاختبار بنجاح اعتبر العقد ساريا للمدة المتبقية منه وينتهي العقد بانتهاء مدته دون حاجة إلى إخطار سابق ، وإذا رغب الطرف الأول في استمرار التعاقد وجب عليه أخطار الطرف الثاني كتابة برغبته في التجديد قبل موعد نهاية العقد بثلاثين يوما على الأقل .

### ٣ـ ساعات العمل

يحدد الطرف الأول أوقات وساعات العمل من وقت لآخر لتنفيذ ومتطلبات العمل بنظام المناوبة وما يقرره مدير المشروع ، ولكنها تبقى فى إطار ساعات العمل المصرح بها ضمن القانون وهى ٨ ساعات يوميا، وعلى الطرف الثاني الالتزام بأوقات الدوام المحددة من الطرف الأول.

### ٤ـ الأجـر

يدفع الطرف الأول إلى الطرف الثاني إثناء قيام الأخير بمباشرة واجباته أجرا لكل سنة بمعدل ٣١٦٨٦ ( قريبا ١١٥٠٢٠ ريال قطري) بدولار أمريكي ويحصل الطرف الثاني على أجر كامل في يوم الراحة الاسبوعية مع راتبه التي تدفع ٢٦ مرات سنوياً، إضافة إلى ذلك يتقاضى الطرف الثاني يوميا علاوة طعام قدرها ٢٥ دولار أمريكي(قريبا ٩٠ ريال قطري) تدفع بالعملة


Initial

Exhibit 1

DynCorp International                    DYNCORP                شركة دان. كــورب الدولية د.م.م. ف ٤ فـتـح
P.O. Box: 24485, DOHA - QATAR, Tel.: (+974) 4868280 / 4868480     INTERNATIONAL     ص.ب: ٢٤٤٨٥، الدوحة - قطر، تليفون: ٤٨٦٨٢٨٠ / ٤٨٦٨٤٨٠ (٩٧٤+)
C.R. No.: 22745 - Fax: 4868280                                                      سجل: ٢٢٧٤٥، فاكس: ٤٨٦٨٢٨٠

daily subsistence allowance in the amount of **US$25.** (approximately 90 Qatari Riyal)  The First Party shall require the Second party to work overtime whenever required including holidays. Such overtime hours shall be paid in accordance with Local Labor Law.

المحلية كما يحصل على مقابل نقدي لساعات العمل الإضافية وفقا لأحكام قانون العمل .

## 5. TRAVEL

a) The First Party shall bear the travel expenses of the Second Party from the city of Home of Record to the work in the State of Qatar, as well as the cost of the return passage.

٥- نفقات السفر :

ا - يتحمل الطرف الأول نفقات سفر الطرف الثاني من مدينة الوصول الى مكان العمل بدولة قطر وكذا نفقات عودته اليها.

b) The First Party shall also bear the travel costs of the Second Party for the purpose of vacation as stipulated in the employment contract (6. Leaves) The expenses shall not cover costs of the acquiring a passport or payments against any guarantees

ب - يتحمل الطرف الأول كذلك نفقات سفر الطرف الثاني ذهابا إيابا اثناء فترة الاجازة السنوية ولا تشمل هذه النفقات تكاليف استخراج جواز السفر او دفع اية تأمينات.

c) The First Party shall be exempted from payment of return expenses of the Second Party in case of resignation before the expiry of date of the contract or in the event he commits a breach resulting in his dismissal in accordance with the provision of the Qatari Labor Law.

ت — يعفى الطرف الأول من تحمل نفقات السفر في حالة استقالة الطرف الثاني قبل انتهاء مدة العقد أو في حالة ارتكابه خطأ يترتب عليه فصله من العمل بدون إنذار ودون منحه مكافأة نهاية الخدمة طبقا لأحكام قانون العمل القطري .

## 6. LEAVES AND HOLIDAYS

a) The Second Party is entitled for a normal yearly paid leave not less than three (3) weeks after completion of one year continuous service with the First Party. The Second Party shall receive full pay during the following official holidays:
Eid Al-Fitr (Three (3) Working Days)
Eid Al-Adha (Three (3) Working Days)
Independence Day (One (1) Working Day)
The Second Party is also entitled for three (3) additional holidays with full pay during the year (only if any one of the above said

٦- الإجازات العطلات

(أ) للطرف الثاني الحق في إجازة سنوية لا تقل مدتها عن ثلاثة أسابيع بأجر كامل. يحصل الطرف الثاني على أجر كامل في الإجازات الرسمية الآتية:-

- عيد الفطر          ثلاثة أيام عمل
- عيد الأضحى        ثلاثة أيام عمل
- عيد الاستقلال      يوم واحد عمل

كما يحصل الطرف الثاني على ثلاثة أيام عمل


Initial

Exhibit 1

**DynCorp**
INTERNATIONAL

شركة داين كورب الدولية ذ.م.م - فرع قطر
ص.ب: ٢٤٤٥٥، الدوحة - قطر، تليفون: ٤٦٠٨٢٨٠/٤٦٠٨٤٠٩ (٩٧٤+)
س.ت: ٢٢٧٤٥، فاكس: ٤٦٠٨٢٨٨

holidays occur during this contract period)
These days are decided by the First Party.
(b)  The Second Party is entitled for sick
leave with pay after three months of
continuous service with the First Party in
accordance with the Qatari Labor Law.

بأجر كامل خلال العام وهذه الأيام  ( الاجازات
المذكورة يستحق الطرف الثاني فقط اذا تحدث أى
اى اللجازة خلال هذه الفترة من العقد) يقررها
الطرف الأول للعمال جميعا .

ب - يستحق الطرف الثاني عطلة مرضية مدفوعــة
لمدة ١٤ يوما و وذلك وفقا لقانون العمل القطري.

## 7. MEDICAL AND SOCIAL CARE

The First Party shall provide the Second
Party with the required medical treatment in
accordance with rules and regulations in
force in the State of Qatar and DynCorp
policy.  The First Party undertakes that the
Second Party will receive his payable
indemnity of labor injuries, disability or death
during work or arising there from in
accordance with the Qatari Laws in this
regard.

## ٧- الرعاية الطبية والاجتماعية

يوفر الطرف الأول للطرف الثاني العلاج الطبي
اللازم طبقا للأنظمة واللوائح المعمول بها في دولة
قطر ووفقا سياسة دين كورب . يتعهد الطرف الأول
بحصول الطرف الثاني على التعويض المستحق له
عن إصابات العمل والعجز والوفاة التي تنشأ عن
العمل أو بسببه طبقا للقوانين القطرية في هذا الشأن .

## 8. ACCOMODATION

The First Party undertakes to provide a free
air conditioned shared bachelor
accommodation for the use of the Second
Party equipped with beds and suitable
bathrooms with appropriate sanitary and
health conditions.

## ٨ – السكن

يتعهد الطرف الأول بتدبير سكن مشترك مكيف
لأعزب مجانا للطرف الثاني مزودا بالأسرة ودورات
المياه المناسبة وفقا للشروط الصحية .

## 9. TRANSPORTATION

The First Party shall provide the Second
Party a free shared transportation from
accommodation to the place of work and
return.

## ٩ - المواصلات

يوفر الطرف الأول للطرف الثاني وسيلة مواصلات
مشتركة مجانا من السكن إلى مكان العمل وبالعكس.

## 10. PERSONAL EQUIPMENTS

The First Party shall provide uniforms,
equipment, and special gear to the Second
Party.  It is the responsibility of the Second
Party to properly maintain and safe guard
such personal equipments

## ١٠ - المعدات الشخصية

يوفر الطرف الأول الزي المعدات والأشياء الخاصة
للطرف الثاني ويكون الطرف الثاني مسئول عن حفظ
الزي والمعدات والأشياء الخاصة .

## 11. END OF SERVICE GRATUITY

The First Party shall pay to the Second Party
end of service gratuity in the amount of
**US$3900**, (approximately 14157 Qatari Riyal)

## ١١ - مكافأة نهاية الخدمة

يدفع الطرف الأول للطرف الثاني مكافأة نهاية الخدمة
بمبلغ وقدره ٣٩٠٠ دولار أمريكي(قريبا ١٤١٥٧

Initial ___   Exhibit 1

**DynCorp International LLC  Qatar Branch**
P. O. Box: 24455, DOHA - QATAR, Tel.: (+974) 4608280 / 4608409
C.R. No.: 22745 - Fax: 4608288



شركة داين كورب الدولية ذ.م.م. فرع قطر
ص.ب: ٢٤٤٥٥، الدوحة - قطر، تليفون: ٤٦٠٨٢٨٠/٤٦٠٨٤٠٩ (٩٧٤+)
س.ت: ٢٢٧٤٥، فاكس: ٤٦٠٨٢٨٨

not less than three weeks basic pay for each year of service.

## 12. REPATRIATION OF REMAINS

In the event of death of the Second Party during the terms of this contract his remains and personal belongings shall be repatriated to the home of record of the expenses of the First Party.   In case the repatriation of remains is not possible, the same may be disposed of upon prior approval of the Second Party's next of kin.

## 13. TERMINATION OF SERVICE AND RENEWAL OF CONTRACT

The First Party shall notify the Second Party at least one month prior to termination date of this contract, that the First Party wishes to renew this contract for further period in accordance with the terms and conditions contained herein as or amended.  In this case, the Second Party shall within fifteen (15) days from the date of receiving the notice express in writing the acceptance of the proposed renewal of this contract.

## 14.  DEPARTURE FROM QATAR ON TERMINATION OF CONTRACT

The Second Party shall depart from the State of Qatar immediately after the termination of this contract unless the First Party agrees to his staying and the competent authorities have agreed to this.  In that case the First Party shall not be responsible for the costs of repatriating the Second Party back to the Home of Record.

## 15. DUTIES OF EMPLOYEE

## The Second Party Shall:

a) Devote the whole of her time, skill, experience and energy while on duty to the service of the company and shall diligently and carefully perform the duties required of him by the company

ريال قطري) بحيث لا تقل عن اجر ثلاثة أسابيع عن كل سنة خدمة .

## ١٢ - إعادة الجثمان

في حالة وفاة الطرف الثاني اثناء سريان عقد العمل فان جثمانه مع المتعلقات الأخرى سيتم أعادته إلى الولايات المتحدة الأمريكية على نفقه الطرف الأول وفي حال عدم امكانية أعاده الجثمان فانه يمكن التصرف فيه بالموافقة لاقرب الاقربين للطرف الثاني .

## ١٣ - انتهاء الخدمة وتجديد العقد

يبلغ الطرف الأول الطرف الثاني خطيا قبل نهاية هذا العقد لمدة لا تقل عن شهر بأن الطرف الأول يرغب في تجديد هذا العقد وفقا للبنود والشروط الواردة فيه وما يستجد من تعديلات وعندها يجب على الطرف الثاني أن يبدى وفي غضون خمسه عشر يوما من تاريخ تبلغه بالأشعار موافقته أو عدم موافقته خطيا على تجديد هذا العقد

## ١٤ - مغادرة قطر لدى انتهاء العقد :

يجب على الموظف مغادرة دولة قطر عند انتهاء تعاقده مع الشركة الا إذا وافقت الشركة على بقاءه وموافقة السلطات المختصة على ذلك وفي تلك الحالة لا تكون الشركة مسئوله عن تكاليف سفر وعوده الطرف الثاني إلى بلده .

## ١٥ - واجبات الموظف

يلتزم الموظف بما يلي:
أ - أن يكرس أثناء العمل كل وقته ومهارته ويلزمه وخبرته وطاقته كما ينبغى ويتعين أن يؤدي بكل حرص وعناية الواجبات الملقاة على عاتقه من قبل الشركة



Initial

Exhibit 1

**DynCorp International LLC   Qatar Branch**
P. O. Box: 24455, DOHA - QATAR, Tel.: (+974) 4608280 / 4608489
C.R. No.: 22745 - Fax: 4608288

**DynCorp**
INTERNATIONAL

شركة داين كورب الدولية ذ.م.م. فرع قطر
ص.ب: ٢٤٤٥٥، الدوحة - قطر، تليفون: ٤٦٠٨٤٨٩/٤٦٠٨٢٨٠ (٠٩٧٤)
س.ت: ٢٢٧٤٥، فاكس: ٤٦٠٨٢٨٨

b) Obey and comply with all lawful orders and instructions given by the company, acting through its officials.

c) Faithfully observe all the internal rules and regulations of the company

d) Endeavor to the utmost of her ability and within the scope of her employment to promote and safeguard the interests of the company and protect its property from theft, loss damage and neglect.

e) Restore to the company all equipment, property and documents of the company at the conclusion of this contract.

f) Not at any time during the continuance of this employment hereunder be engaged directly or indirectly in any other business occupation in whatever capacity.

g) No at any time either during the continuance or after termination of this contract divulge to a third party any knowledge or information relating to the company's affairs, business, transaction of the company's management.

**16. CONCLUDING PROVISIONS**

a) If the First Party could not for any reason obtain an entry visa into Qatar for the Second Party this contract shall be automatically considered void, non-effective and non-enforceable.

b) The competent courts of Qatar shall alone, have jurisdiction to hear and consider any difference or dispute arising out of the interpretation or implementation of this contract.

c) The First Party relevant internal regulations, instructions and procedures shall be deemed as an

ب - ان يكون مطيعا وأن يمتثل لكل ما هو قانوني من الأوامر والتعليمات الصادرة له من رؤسائه في الشركة

جـ - ان يتقيد بأمانة إخلاص بكل لوائح وأنظمة العمل الداخلية للشركة .

د - ان يسعى حثياً وبكل طاقته من خلال وظيفته ومن أجل المحافظة على مصالح الشركة وحماية ممتلكاتها من التعرض أو الفقدان أو التلف أو الإهمال.

هـ - ان يعيد للشركة فور انتهاء العقد كل ما لديه من متلكات او معدات واية وثائق أو أوراق تخص الشركة

و - لا يجوز للطرف الثاني بأي حال ماد لم هذا العقد ساري المفعول ان يرتبط بشكل مباشر أو غير مباشر بأى عمل آخر لدى الغير مهما كان سواء بأجر أو بدون أجر.

ز - لا يجوز للطرف الثاني أثناء خدمته او بعد تركة للخدمة في الشركة الإفضاء ء للغير بأى معلومات أو إفشاء أي إسرار تتعلق بأمور ومصالح وأعمال وممتلكات الشركة بدون الحصول على تفويض خطى مسبق من إدارة الشركة.

١٦ - أحكام ختامية

أ - اذا لم يتمكن الطرف الأول ولأي سبب من الأسباب من استخراج تأشيرة دخول للطرف الثاني فان هذا العقد يعتبر لاغيا تلقائيا وغير نافذ ولا أثر أو مفعول له.

ب - تكون محاكم قطر هي المختصة وحدها وذات الصلاحية للنظر في أي خلاف أو نزاع ينشأ عن تفسير او تنفيذ هذا العقد.

ج - تعتبر اللوائح والأنظمة الداخلية للشركة ذات الصلة بهذا العقد وما تصدره من تعليمات جزء متمماً لأحكام هذا العقد.

Initial 

Exhibit 1

**DynCorp International LLC   Qatar Branch**
P. O. Box: 24455, DOHA - QATAR, Tel.: (+974) 4608280 / 4608409
C.R. No.: 22745 - Fax: 4608288

**DynCorp**
*INTERNATIONAL*

شـركة داين كورب الدوليـة ذ.م.م. فـرع قـطر
ص.ب: ٢٤٤٥٥، الدوحة - قطر، تليفون: ٤٦٠٨٤٠٩/٤٦٠٨٢٨٠ (+٩٧٤)
س.ت: ٢٢٧٤٥، فاكس: ٤٦٠٨٢٨٨

d) The provisions of this contract agreement are governed by the Qatar Labor Law No.14 of the Year 2004 and its executive decisions and as such they constitute the basis to resort to in the event of any dispute arising between the two parties unless the conditions of contract include more favorable advantages to the Second Party.

e) This contract is made and issued in three original copies. One copy shall be kept by the First Party and one copy shall be given to the Second Party, the third copy shall be filed at the Ministry of Civil Service Affairs and Housing.

f) This contract cancels any agreement or contract preceding it.

g) Incase of disparity between the Arabic and English text, the Arabic text alone shall prevail

Reference to the masculine gender in the contract shall include the feminine.

In confirmation of the above, the two parties have singed this contract on the date specified at the beginning of this contract.

د - يعتبر قانون العمل الصادر بالقانون رقم (١٤) لسنة ٢٠٠٢ والقرارات المنفذة له الأساس القانوني لنصوص هذا العقد ، ويتم الرجوع آلية في أي نزاع ينشأ بين الطرفين مالم تكن شروط هذا العقد تتضمن مزايا افضل للطرف الثاني.

هـ - تحرر هذا العقد من ثلاثة نسخ أصلية يحتفظ الطرف الأول بإحداها وتسلم الثانية **الطرف الثاني** وتودع الثالثة بإدارة العمل بوزارة شئون الخدمة المدنية والإسكان.

و - يلغى هذا العقد اية اتفاقيات او عقود سابقة عليه .

ز - في حالـة أي اخـتلاف بـين النـصـيـن العربـي والإنجليزي يعتبر النص العربي هو النص المعترف به قانونا .

**كل ما يرجع إلى المذكر في هذا العقد يشمل المؤنث .**

إقرارا لما تقدم وقع الطرفان على هذا العقد في التاريخ المذكور في صدر هذه الاتفاقية .

**First Party**  (DynCorp International )

**الطرف الأول -** (داين كورب الدولية)

**ROSETTA SPENCER**
Second Party

**الطرف الثاني**

Initial

Exhibit 1

**DynCorp**
**INTERNATIONAL**
Base Security Services-QA, Doha, Qatar

Friday, 25 January 2008

Reply to: Human Resource Supervisor

**SPENCER, ROSETTA**
**Contract Start Date: 01 Apr 2008**
**Clock Number: 943741**

<u>Subject: Re-contracting FSA</u>

Congratulations! On 31 March 2008 you will have completed your current employment contract with DynCorp International. Thank you for your successful contribution to the Base Security Services Qatar contract.

Please notify us of your intention to either accept or decline the 1 April 2008 - 31 Mar 2009 (one year) contract by signing below. If you accept, please sign both documents and return them to the Human Resources Department on/before 1300 hours, 30 January 2008 via your supervisor. If you decline, sign only this document. Failure to respond by the due date will be considered as a declination.

Acceptance of this offer is contingent upon you passing your physical agility test, M-16 and 9MM qualification, and physical exam (if required).

If you have any questions, do not hesitate to contact the Human Resources Department at 587-1585/585-4693/581-7490.

Respectfully,

Natividad Gonzalez
Program Manager

COPY

<u>SPENCER, ROSETTA (Sign One)</u>

Accept........................... Decline........................... Date 27-JAN-08

Would like to discuss this further with ........................ before I make a final decision.

**P.O.Box 24455, Doha, Qatar Tel: +974 460 8274; Fax: +974 460 8288**

Exhibit 1

| DynCorp International | Title: | Number: |
| --- | --- | --- |
| Base Security Services | GUARD PERFORMANCE EVALUATION | 312-PE |
| Unit Issuing: | Effective Date: | Revision No. | Approved By: | Page 1 of 2 |
| Human Resources | 2/7/2007 | 7 | Natividad Gonzalez | |

# PERFORMANCE EVALUATION

## Part I – Administrative Data

| Name (Last, First, MI) | Employee ID: | Period Of Evaluation: (Day, Month, Year) |
| --- | --- | --- |
| Spencer, Rosetta | 943741 | |

| Duty Position | Employee: I understand my signature does not constitute agreement or disagreement with this evaluation. I have been counseled on and seen the final report. | Signature & date: | 3-3-2007 |
| --- | --- | --- | --- |
| Guard | | *Rosetta Sp* | |

| Name and duty position of first line supervisor: | Signature and date: |
| --- | --- |
| Michael S. Davis    Lead Guard | *Michael S. Davis* 3MAR 2007 |

| Name and duty position of second line supervisor: | Signature and date: |
| --- | --- |
| Gary Shephard, GSS | 03-03-07 |

## Part 2 - Evaluation

### a. Appearance
- Wears uniform IAW SOP
- Grooming is IAW SOP
- Presents a professional bearing

*Bullet comments are mandatory*
Ms. Spencer's overall appearance is professional, and exceeds DynCorp standards on a daily basis.

| Excellent | | Good | | Fair | Un-Sat |
| --- | --- | --- | --- | --- | --- |
| 6✓ | 5 | 4 | 3 | 2 | 1 |

### b. Working Relationships & Professionalism
- Conduct reflects favorably on the company
- Works well with the public
- Works/lives well with co-workers

*Bullet comments are mandatory*
Ms. Spencer is well liked by her peers and has a good working relationship with the CAS community. Her conduct reflects favorably on DynCorp International.

| Excellent | | Good | | Fair | Un-Sat |
| --- | --- | --- | --- | --- | --- |
| 6✓ | 5 | 4 | 3 | 2 | 1 |

### c. Duty Performance
- Accomplishes tasks, missions
- Understands and applies SOPs
- Provides quality work

*Bullet comments are mandatory*
Ms. Spencer provides Bravo Team with quality work. To the best of my knowledge Ms. Spencer has never failed to accomplish any task or mission set before her, and her understanding of company SOPs is far above average.

| Excellent | | Good | | Fair | Un-Sat |
| --- | --- | --- | --- | --- | --- |
| 6✓ | 5 | 4 | 3 | 2 | 1 |

Exhibit 2

| DynCorp. | Title: | | | |
|---|---|---|---|---|
| B&E Security Service | EVALUATION REPORT - GROUP II | | | |
| Unit Issuing: Human Resources | Effective Date: 2/7/2007 | Revision No. 7 | Approved By: Natividad Gonzalez | Page 1 of 2 |

| Name (Last, First, MI) Spencer, Rosetta | Employee ID: 943741 | Period Of Evaluation: (Day, Month, Year) |
|---|---|---|

| **d. Competence** <br> • Exhibits sound judgment <br> • Uses initiative <br> • Possesses technical knowledge and skills | *Bullet comments are mandatory* <br> Ms. Spencer is always willing to take the initiative; her technical knowledge and skill are above that of the average guard. When in the performance of her duties Ms. Spencer always exhibits sound judgment. |
|---|---|

| Excellent | | Good | | Fair | | Un-Sat |
|---|---|---|---|---|---|---|
| 6̸ | 5 | 4 | 3 | 2 | | 1 |

| **e. Responsibility & Accountability** <br> • Takes care of accounts for government and company property <br> • Incorporates safety in all activities <br> • Dependable in word and action | *Bullet comments are mandatory* <br> Ms. Spencer takes care of and accounts for government and company property. Ms. Spencer incorporates safety in all of her activities and is dependable in word and action. |
|---|---|

| Excellent | | Good | | Fair | | Un-Sat |
|---|---|---|---|---|---|---|
| 6̸ | 5 | 4 | 3 | 2 | | 1 |

| **f. Leadership** *(applies only to supervisors)* <br> • Sets a positive example <br> • Coaches, mentors and develops subordinates <br> • Solves problems at the appropriate level <br> • Plans, organizes, and implements | *Bullet comments are mandatory* <br> .Ms. Spencer's positive attitude, understanding of company SOP's and willingness to work any post make it easy for me to recommend her for promotion to ECP Team Leader, and Alternate Lead Guard. |
|---|---|

| Excellent | | Good | | Fair | | Un-Sat |
|---|---|---|---|---|---|---|
| 6̸ | 5 | 4 | 3 | 2 | | 1 |

Part 3 – Performance and Potential

Exhibit 2

| DynCorp | TRI: | EVALUATION REPORT CONTINUE | (FORM#:) |
|---------|------|---------------------------|----------|
| Base Security Service | | | HR #101 |
| Unit Issuing: Human Resources | Effective Date: 2/7/2007 | Revision No. 7 | Approved By: Natividad Gonzalez | Page 1 of 2 |

## Overall Performance

| Excellent | | Good | | Fair | Un-Sat |
|-----------|---|------|---|------|--------|
| ✓ | 5 | 4 | 3 | 2 | 1 |

## Potential

- [✓] Promote Now
- [ ] Consider for promotion later
- [ ] Do not promote
- [ ] Other: _____

List three positions for which the employee is best suited:

1. Lead Guard
2. SAS
3. CCTV

Part 4 – Employee Input (optional)

Exhibit 2

| DynCorp | Title: | | HR 0303 |
|---|---|---|---|
| Document Security Scroll | EVALUATION REPORT (CRITERIA) | Approved by: | |
| Unit Issuing: Human Resources | Effective Date: 2/7/2007 | Revision No. 7 | Natividad Gonzalez | Page 1 of 2 |

# PERFORMANCE EVALUATION

Part I – Annual Evaluation Data

| Name (Last, First, MI) Spencer, Rosetta | | Employee ID: 943741 | Period Of Evaluation: (Day, Month, Year) 6-2007 to 12-2007 |
|---|---|---|---|
| Duty Position **Guard** | Employee: I understand my signature does not constitute agreement or disagreement with this evaluation. I have been counseled on and seen the final report. | Signature & date: *Roselle Spen* | 12-27-07 |
| Name and duty position of first line supervisor: **Lead Guard, William Price** | | Signature and date: *[signature]* | 12/27/07 |
| Name and duty position of second line supervisor: **Shift Commander, Robert Long** | | Signature and date: *Robert A. Long* | 30 DEC 07 |

Part II – Annual Evaluation

**a. Appearance**
- Wears uniform IAW SOP
- Grooming is IAW SOP
- Presents a professional bearing

*Bullet comments are mandatory*
Ms. Spencers appearance is always outstanding. She looks and acts sharp at every post.

| Excellent | | Good | | Fair | Un-Sat |
|---|---|---|---|---|---|
| 6 | (5) | 4 | 3 | 2 | 1 |

**b. Working Relationships & Professionalism**
- Conduct reflects favorably on the company
- Works well with the public
- Works/lives well with co-workers

*Bullet comments are mandatory*
Ms. Spenser is both liked and respected by both the public and her peers.

| Excellent | | Good | | Fair | Un-Sat |
|---|---|---|---|---|---|
| (6) | 5 | 4 | 3 | 2 | 1 |

**c. Duty Performance**
- Accomplishes tasks, missions
- Understands and applies SOPs
- Provides quality work

*Bullet comments are mandatory*
Ms. Spencer gives an outstanding job performance daily. She is one of our most knowledgeable and capable guards.

| Excellent | | Good | | Fair | Un-Sat |
|---|---|---|---|---|---|
| 6 | (5) | 4 | 3 | 2 | 1 |

Exhibit 2

ByteCorp
Unit Insignia
Human Resources

EVALUATION REPORT

Effective Date:
2/7/2007

7

Natividad Gonzalez

Page 1 of 2

| Name (Last, First, MI) | Employee ID: | Period Of Evaluation: (Day, Month, Year) |
|---|---|---|
| Spencer, Rosetta | 943741 | 6-2007 to 12-2007 |

**d. Competence**
- Exhibits sound judgment
- Uses initiative
- Possesses technical knowledge and skills

| 6 | (5) | 4 | 3 | 2 | 1 |
|---|---|---|---|---|---|

*Bullet comments are mandatory*
Ms. Spencer has excellent knowledge of CAS policy and procedures. She also has an outstanding judgment and highly motivated outlook.

**e. Responsibility & Accountability**
- Takes care of accounts for government and company property
- Incorporates safety in all activities
- Dependable in word and action

| (6) | 5 | 4 | 3 | 2 | 1 |
|---|---|---|---|---|---|

*Bullet comments are mandatory*
Is safe and highly dependable in every way of the job. She is one of the most reliable, and trustworthy individuals I have ever had the pleasure to work with.

**f. Leadership** (applies only to super isors)
- Sets a positive example
- Coaches, mentors and develops subordinates
- Solves problems at the appropriate level
- Plans, organizes, and implements

| 6 | 5 | 4 | 3 | 2 | 1 |
|---|---|---|---|---|---|

*Bullet comments are mandatory*
Has not worked a leadership post in the past 3 months of me taking over Charlie squad on bravo team. However I do feel she would make a great leader in the future.

**Overall Performance**

| 6 | (5) | 4 | 3 | 2 | 1 |
|---|---|---|---|---|---|

**Potential**

[x] Promote Now

[ ] Consider for promotion later

[ ] Do not promote

[ ] Other: _____

List three positions for which the employee is best suited:

| 1. ATL LEADGUARD | 2. SOC 1 | 3. POST 26 |
|---|---|---|

Exhibit 2

# Critical Services Performance Checklist # 19
# Base Security Services
# DABM09-03-C-0014
### (Revised 8 November 2007)

# Entry Control Points (ECP's) C.5.2.1

# Weekly Specific Evaluation

Rating for this evaluation is: ___Good___ (Excellent, Good, Satisfactory, Unsat)

Date of this evaluation is: _21 Dec 2007_ Evaluator is: _TSgt Koonce_____

1. Are the ECP's 100% accurate in access control per the SOP?

____ Exceeded Standards (provide precise information)
_X_ Met Standards
____ Failed to Meet Standards (provide precise information).

2. Is the departure control guard 100% knowledgeable of departure control policy?

____ Exceeded Standards (provide precise information)
_X_ Met Standards
____ Failed to Meet Standards (provide precise information).

3. Is 100% of SOP required GFP on site?

____ Exceeded Standards (provide precise information)
_X_ Met Standards
____ Failed to Meet Standards (provide precise information).

4. Is the contractor 100% accurate in badging operations?

____ Exceeded Standards (provide precise information)
_X_ Met Standards
____ Failed to Meet Standards (provide precise information).

5. Are the guards 100% accurate in operation of the detection equipment per the SOP?

Exhibit 2

_____ Exceeded Standards (provide precise information)
__X__ Met Standards
_____ Failed to Meet Standards (provide precise information).


6. Does the contractor maintain a ninety-five percent (95%) detection rate of EOD tests attempts to pass through security?

_____ Exceeded Standards (provide precise information)
__X__ Met Standards
_____ Failed to Meet Standards (provide precise information).


7. Observations and comments:
Conducted with: Ms. Spencer and Mr. Bryan. Both guards were alert and had full control and accountability of all personnel assigned to the area. They were highly knowledgeable of the SOP and area specific procedures to include the details of the continuously changing badges accepted; due to the fluidly transient personnel. The post area was well in order. All SOP's, Special Order Logs, Off Post Passes, and Personal Property (such as cell phones) were properly located and safe guarded for protection and accountability. Each had all required equipment.

Exhibit 2